McBride, Judge,
delivered the opinion of the Court.
AnnRose, by her next friend, brought her bill against Moses D. Bates, and others, in the Marion circuit court.
The bill charges that she has for many years last past been acting as a feme sole, by virtue of a contract of separation between her husband, Samuel rose, and herself, that she was possessed of a large property before her marriage with Samuel Rose, and upon their separation, a considerable portion of property, of various kinds, was secured to her, for her separate use, and free from the control of her husband.
That in the year 1835 the complainant removed from the State of Pennsylvania with her son-in-law, Hugh Meredith, to this State, converting, prior to her removal, most of her separate estate into money, she was enaabled to raise about $10,000, the wreck of a large estate, which she confided to said Meredith, and entrusted him with the management of her business generally. That the said Meredith being disposed to enter into business, she permitted him to use her money as he thought best, she claiming and receiving from him, in the meantime, a comfortable maintainance. That after a time the said Meredith became greatly embarassed, so that she distrusted his ability to refund to her the amount she had loaned him; in this state of affairs, it was concluded between them, that Meredith should secure her one half of the amount loaned, by mortgage on his property; accordingly, on the seventh December, 1841, he executed to her a mortgage on a part of lot No. 8, in block No. 7, in Hannibal, to secure her in the sum of $5,000. It was understood at the time, that a portion of the purchase money of said lot remained unpaid.
That the lot in question was purchased in July, 1839, by Hugh Meredith, Hamilton D. Meredith, and Napoleon B. Tapscott, jointly, of one Robert Buchanan, that a part of the purchase money was paid at the time, and a note executed for the balance, $700, payble the first April thereafter; that Buchanan executed to them his title bond for a deed, when the purchase money was fully paid.
*33 That on the first October 1839, Hamilton D. Meredith departed this life, he not having paid any part of the purchase money, nor have his representatives, since his death, paid any part of the purchase money. That after his death, apart of the note given to Buchanan was paid, and anew note executed by Hugh Meredith and Tapscott, for $300, that being the balance then remaining unpaid on said purchase ; shortly thereafter, the last named note, by assignment, come to the hands of Moses D. Bates, who on the — day of— 18-instituted suit thereon, against the makers, and prosecuted the same to judgment and execution. In the mean time, a dissolution of the partnership of Tapscott and Meredith had taken place, and on settlement between them, the former sold to the latter his interest in the corner of the lot in question, upon which part of the lot they had erected a large brick building.
That when the execution of Bates against Tapscott and Meredith was issued, both of them were insolvent. Bates supposing, however, that he had a lien on the lot for the balance of the purchase money, caused his execution to be levied thereon ; whereupon the complainant become apprehensive that she would lose her security, she therefore urged Meredith to make some arrangement to settle the debt of Bates. Meredith assured her that it should be done, as Bates had told him, more than once, that he would give him time to raise the money, provided the payment was rendered secure. That to effect an arrangement with Bates, she authorized Meredith to act as her agent, but if no satisfactory arrangement could be made with Bates, then her agent was to purchase the property for her at the sheriff’s sale, if the same was not bid so high as to disable her from paying the same.
That the lot having been levied on, was advertised for sale by the sheriff on the 10th January 1842, at which time Bates proposed to Meredith that he Bates would bid off the property for the benefit of the complainant, and to be conveyed by him to her, by quit claim deed, when she should pay the amount of the execution with interest and costs. But Meredith preferred bidding for the property himself, and would have secured the property to her and the debt to Bates, had not the latter, by bidding for the property himself, run it up to $1010, when it was struck down to Meredith, who found it impossible to pay the sum bid, whereupon it was agreed betwéen Bates and Meredith, that a re-sale should be made by the sheriff, on the thirteenth of the same month, when Bates was to become the purchaser of the property for the benefit of complainant, and the said property was to be conveyed to her by Bates, whenever she paid him his debt. In the meantime she was to retain possession, paying *34 Bates at the rate of ten dollars per month for rent of the property, or interest on his money. A written instrument, setting forth the above contract, was to be executed by Bates immediately after the sale. Under this express agreement between Bates and Meredith as agent for the complainant, a second sale was made of the property, and Bates became the purchaser, at the sum of $365, that being the amount of his execution.
That after the sale, on the thirteenth Janu-ary 1842, Bates instructed ■his attorney to prepare an instrument of writing, to be executed by him, evidencing the foregoing agreement; it was, however, concluded upon consultation, that this was not necessary, as his honor was a sufficient guaranty. Accordingly, the complainant set about raising the money to pay Bates’ claim/ thereby to release herself from the exorbitant usury which he was charging her, and bring the matter to a close. But the complainant soon had reason to fear that further trouble awaited her, as she was informed by her agent, Meredith, that Bates said he would not comply with their agreement unless Meredith would pay a small debt which one J. M. Clark owed Bates, of about $30, and afterwards he demanded as a condition to -his compliance, that Meredith should pay certain of his own creditors. The complainant believing that she was under no moral or legal obligation to pay the debts named, and as they had no connection with the agreement between her and Bates, refused to comply with his unreasonable demand.
That prior to the filing of her bill, the complainant, through her agent, Meredith, tendered to Bates the full amount of his debt, together with the rent or interest due, according to the terms of their agreement, and demanded a deed from him, when the said Bates refused to accept the amount tendered, and to execute to her a quit claim deed for the lot purchased by him as aforesaid, but claims the property as his own, and denies having made the agreement heretofore set out..
The bill makes Bates a party defendant, and concludes with a prayer that he be compelled, upon the payment of his debt, interest and costs, to convey the property in dispute to complainant, by a quit claim deed, and for general relief.
The defendant, Moses D. Bates, filed his answer to the complainant’s bill, in which he states that he has no knowledge of the private relations or domestic difficulties of the complainant. That he as assignee of Buchanan, brought suit and abtained judgment on the note as charged in the bill, that he sued out execution on his judgment, which was levied by the sheriff on the lot in controversy, and at the sale of the same he became the purchaser, and has obtained a deed for the said lot from the *35 sheriff. He densies that he bought the lot for the complainant, or for any one, upon the terms set out in the bill, or upon any terms whatever ; that he was willing to give Dr. Meredith time upon the debt, provided he could procure the written assent of Buchanan, the assignor of the note, but that assent could not be procured by Dr. Meredith, that he informed Meredith, and agreed with him to that effect, that if there was no competition he would buy in the property for the amount of his debt, and would relinquish the same to him or any person-whom he desired, on payment of his claim and costs with ten per cent, and ten dollars a month for the rent of the house, if paid in any short time, that he has no recollection of having ever heard that Meredith had a morther-in-law, much less that Meredith was making this agreement as agent for complainant.
That the foregoing agreement was made prior to the first sale of the property, and but a day or two before said sale, and that he went to the sale with the intention to fulfil itthat when the sale took place, Meredith, in violation of the agreement, bid off the property himself, thereby putting an end to the agreement between them, that Meredith being unable to pay the purchase money, $1010, procured an order of court for a re-sale of the property on a subsequent day, at which second sale the defendant became the purchaser for himself, and for no other person.
That after the first sale, hostile relations existed between him and Meredith, and no further intercourse took place between them, in reference to the subject—no new agreement was made by and between them, nor was there any'overture on the part of Meredith to that effect.
That after defendant purchased the property, he learned that Meredith had induced the mechanic who built the house, not to file his lien, by pledging his honor that he should be paid, but had failed to pay him, whereby the lien was lost. Thereupon he respondent said to Dr. Meredith, “ sir, I have bought your property ; if you will pay the mechanic his bill, amounting to about $700 or $800, I still do not want your property. ” Dr. Meredith replied that he would attend to his own business, and declined his proposition. The offer being voluntary on his part is not binding.
That afterwards the defendant told Brady, the builder, whose lien had been lost as above stated, that he might have the rents of the houses on the lot until his debt was paid, and that Brady has accordingly rented them out.
The complainant, by an amendment to her original bill, sets out the articles of separation between herself and Samuel Bose, her husband, *36 and states that ever since the separation she has done business and dealt as a feme-sole, purchasing and selling real estate, without any interferenceon the part of said Samuel, that she has not seen her said husband for ten years last past, and when she heard from him last he was residing in the State of New York, that she does not know whether the said Samuel Rose be dead or now living, but that he is not a citizen of this State. The amended bill makes him a defendant.
■ An order of publication having been made against Samuel Rose, and proof of publication made, a decree ni si was taken against him.
The complainant then obtained leave further to amend her bill, and filed an amended bill, in which she charges that from the time of the agreement with the defendant Bates, as charged in the original bill, the said Bates has held possession of the property in'dispute, and received and appropriated to his own- use the rents and profits of the same.
That at the date of the sheriff’s sale the property was under lease, at the annual rent of $666,66, and before said lease expired, the lessee, without the knowledge of the complainant, surrendered the possession to the defendant Bates, who has since continued to lease the property and receive the rents therefor.
That on the 24th April, 1843, complainant made a demand in writing upon said Bates for the possession of the premises, which he refused to surrender to her ; that in consequence of Bates’ possession the complainant has been unable to make the necessary repairs to the property, whereby the same has become dilapidated, and sustained injury to the amount of $500, besides the rents have fallen to $600 per annum by reason of the premises being out of repair, which losses, in addition to the rents received by Bates, she prays may be decreed to her.
The defendant Bates filed his answer to the complainant’s second amendment to her original bill, in which he states that the only possession which he has had of the premises, by his tenants or otherwise, has been of the one half of the house, the other half has been in the possession of the complainant, or Dr. Hugh Meredith, or persons claiming under them. He denies having received any portion of the rents , he is informed that some of the tenants have been notified by Meredith or complainant, not to pay the rent to the defendant, and he has thought proper to await the determination of this suit. That a portion of the rents have been, by agreement with Dr. Meredith or complainant, appropriated to the repair of the property in controversy; how much he is unable to state. That he does not know of the prior renting, nor the amount, but believes that the rent has been paid to Dr. Meredith or the *37 complainant; that the whole property, owing to the want of repairs and lack of tenants, has not amounted in rents to one half of the sum specified. He insists on the statute of frauds, even should an agreement of the character charged in the bill, be established against him.
A general replication was filed to the answers of the defendant Bates and the cause was thereupon submitted to the court, upon the original bill, and the answer thereto, the amended bill and the answer thereto; the exhibits and testimony in the cause when the court dismissed the bill of complainant, and decreed the costs against her, whereupon she filed her motion to set aside the decree, and for a re-hearing of the cause, which was overruled, and she accepted and appealed to this court.
The complainant, to sustain her cause, and obtain a decree in accordance with the prayer of her bill, read her original bill and amendments, and then gave the following evidence :
1. Hugh Meredith was sworn to testify as a witness in the cause, when the defendant introduced James R. Garnett, who testified that in the fall of 1841, Dr. Hugh Meredith consulted the witness as to the manner of arranging his property, to save it from execution, until better times. Several modes were discussed between them, when finally it was concluded to mortgage to Mrs. Rose to secure a debt which he Meredith said he owed her, or to save it from sacrifice. He informed witness that he did not wish to defraud any one, only to save his property from sacrifice, until such time as he could sell it for a reasonable price; said something about Mrs. Rose having let him or his wife have some property, but witness’ recollection of the conversation is not distinct.
The complainant then read a release in full from her to Hugh Meredith for the debt secured by the mortgage, taking the risk of obtaining her debt against him out of the property in controversy, whereupon the court permitted Hugh Meredith to testify.
Hugh Meredith testified thet he had been acting as agent for complainant for many years, that the property in ciuestion was under execution in favor of defendant against him witness, and Tapscott. Witness was largely indebted to Mrs. Rose, and had made no preparation to discharge Bates’ debt, because he had reason to believe from the statement of Bates that a sale would not be forced. Bates had frequently said to witness, that he only wished to have his debt made safe.
The first sale of the property took place on the 10th January, 1843, when witness saw Bates in Palmyra, just prior to the sale. Bates took witness up stairs in Thompson’s store, his son-in-law, Thompson, went with us, and there proposed to buy in the property for witness, but wit *38 ness objected, stating that be would rather buy it in himself, as the property was mortgaged to his mother-in-law, Mrs. Rose, to secure her a debt which witness owed her; otherwise he would accede to the proposition. No agreement was then made. Witness went to the court house, believing that Bates would let him buy the property, and made a calculation of the amount of Bates’ claim, during which the sheriff put up the property lor sale, when Bates bid $400 and the witness-$410, and so the bidding continued until finally the property was struck off to witness at $1010. The sheriff informed witness that specie would be required, and that he would wait until the 13th for the money. Witness returned to Hannibal, and borrowed near $500, which he was to have the use of until the first April, for an interest of $50, with the liberty of returning the money in a few days without interest.
On the 12th January witness went back to Palmyra, and agreed on that night to meet his attorney and the attorney of Bates, and talk over the whole matter. He met them agreeable to promise. On the next morning he went to Mr. Bates, and got him to come to town with him witness, and during the morning the following agreement was made between them. Bates was to buy the property at sheriff’s sale, and- give a title bond, and Mrs. Rose was to pay $10 per month and have possession, and redeem whenever she chose. At half past eleven o’clock the sheriff put up the property, and Bates bid it in at about $365. Bates and witness then went into the office of his attorney, Mr. Buckner, when Bates requested Buckner to make out two papers—the lease to Mrs. Rose and the title bond. Buckner advised us not to pass any papers. Bates replied he was satisfied if witness was, and went off. Witness then told Buckner that if he gave that advice on account of any transactions which he supposed to exist between Mrs. Rose and the witness, it was unnecessary, because her claims against him could be substantiated any where. Witness went home and informed Mrs. Rose of what had been done; she was dissatisfied ; he then wrote to Buckner to obtain the bond from Bates, provided it was not entirely inconsistent with his advice. Receiving no answer from Buckner, he went to Palmyra in a few days to see him, when Buckner still advised against passing any papers, assuring witness that as long as he or Wright, or any witness to the transaction lived, Mrs. Rose would be perfectly safe.
At the May term of the court 1842, witness came to Palmyra and tendered Bates $220, which he refused to accept. In September 1842, during court week in Palmyra,, he come up with money sufficient to pay the whole amount of Bates’ debt, and the $10 per month rent. It con *39 sisted of three $100 bills, and the remainder in specie. Bates went with him to Buckner’s office; took one of the notes out and returned, saying the money was good. He then told witness he had a note of Cark’s for $30, which witness must pay; witness would have acceded, but Bates soon started new difficulties. Afterwards, in same month, witness come to Palmyra in company with his brother, Campbell D. Meredith, since deceased, and in the name of Mrs. Rose, tendered to Bates the amount, in money, of his execution, debt, and $10 per month from the date of the last sale—the amount being $447. The money was all in silver coin; it was tendered at a grocery store in Palmyra ; he refused to accept it, and told witness to go and pay his witness debts; several persons were but unknown to witness.
At the time of Bates’ purchase, the property in dispute was leased to Hawkins & Son, and the Shacklefords, for $666,66 per annum.
When witness come to the State in 1835, he owed Mrs. Rose a gross amount of $10,000. This mouey he had collected for her and retained the use of; it was due her from various sources; some from the sale of her property in Pennsylvania, and some from rents and sale of property in South Carolina; in some of the property she only had a life estate, and some of it she owned absolutely.
Witness married the daughter of Mrs. Rose in 1833; her and her husband have not lived together since he became acquainted with her in 1825—saw Samuel Rose several times in Pennsylvania; he did not reside there but in New York. When witness first knew Mrs. Rose she transacted business in her own name, and has continued to do so ever since; she has instituted suits in Pennsylvania and South Carolina in her own name, and has been sued in the name of Ann Rose. Witness has learned that Samuel Rose sold a pretended claim to some property of Mrs. Rose, in Pennsylvania, to his nephew of the same name; has not heard definitely from Samuel Rose for twelve or fourteen years; if alive, he is about sixty-five years of age. Mrs. Rose is about fifty-five years old.
Cross Exabiined.—Witness’ agency for Mrs. Rose commenced gradually without any written authority; on one occasion, when he went to South Carolina, and received $15,00 for her, he had a power of attorney, but does not know where it now is. The money was due for rents.
By or before 1836, witness had received from Mrs. Rose from eight to $10,000, principal and interest. Mrs. Rose has never given his wife any thing by way of advancement, but has been in the habit of giving her 'small amounts and presents. The farm on which Mrs. Rose lived in *40 Pennsylvania, was to be his wife’s at the death of her mother. His accounts with Mrs. Rose have always been loosely kept, in small memorandum books. When witness went to Pennsylvania, in 1837 or 1838, he gave Mrs. Rose bonds to a large amount, that she might have her money in case of his death. He was-then unembarrassed.
Witness never had the conversation with Garnett to which Garnett deposed. He never said to Dr. Jerman or any one else, that he did not owe Mrs. Rose a large amount; any statements to that effect are false.
In 1838 when he gave Mrs. Rose the bonds, she at first declined to take them, but at his request she afterwards took them ; when he returned she gave him the bonds to keep as he kept all her papers. Mrs. Rose did not wish her property to come to Rose’s hands, and was well satisfied that he should use it. Rose frequently tried to get it.
He is certain that at the second sale, Bates did not agree to purchase for him, but for Mrs. Rose. He did not think that Bates would bid against him at the first sale ; he thinks the property worth $5,000 in ordinary times; he feared Bates all the time, but felt that he and Mrs. Rose were in his power, and did the best he could ; thought the arrangement offered by Bates was better than keeping Eastman’s money, which he had borrowed on his terms. At the first sale there was no quarrel between him and Bates.
There was a judgment older than the mortgage, in favor of Richard Boyce, against Tapscott and Meredith. Wright, his attorney, said Bates could he relied upon, and if he died, there would be no danger as long as any witness to the transaction lived.
After the last sale, witness expected to get money from the east with which to pay Bates; Mr. Buckner, he understood, was the attorney or agent for Bates. Boyce’s debt, (about $100,) has been paid. Mrs. Rose is easily influenced, and has generally been under his influence. Bates had promised from time to time to wait on witness, but always deceived him. First he said he would not sue ; after the judgment he promised to wait a year, but he issued execution, alleging that Buchanan required it. At the first sale witness hoped for indulgence, but was suspicious of Bates, and therefore feared for him to bid on the property ; thought that he could bid in the property himself and secure Bates, as he had said all he wanted was his money. Being enquired of how he could secure Bates by buying in the property, when there were a number of judgments against him, he answered that he was no lawyer, and knew but little about the effect of such a purchase.
At the second sale, from the statements of Wright and Buckner, that *41 the honor of Bates might be relied on, witness agreed that Bates might purchase in the property. Being asked why he did not take the money borrowed of Eastman and pay off Bates’ debt, witness answered that he was told by his lawyer that if he paid Bates, the surplus of his bid would be ordered into court for distribution among his creditors.
2. A mortgage from Hugh Meredith to Ann Rose, dated the 7th December, 1841, conveying to her the property in dispute, to secure the payment of $5,000.
3. A deed from N. B. Tapscott and wife to Hugh Meredith, dated the 4th December, 1840, conveying all their interest and title to the lot in dispute, to said Meredith.
4. The judgment and execution in favor of Moses D. Bates, against N. B. Tapscott and Hugh Meredith, under which the sale by the sheriff was had, with the sheriff’s return on the execution.
5. The sheriff’s deed to Bates under the sale above named. The judgment, execution, and sheriff’s deed, were read, by agreement, from the records and files in the clerk’s office.
6. The testimony of Isaac Holt, who was present at the second sale of the property by the sheriff; he heard a conversation between Moses D. Bates and Hugh Meredith, in which it was agreed that Bates was to buy in the property, and Meredith was to have time to redeem it, upon paying the amount which Bates bid with interest. Mr. Buckner was present or in the office during the conversation. Witness was not present at the first sale; he is certain that Bates bid in the property at the sale at which he was present ; he intended to buy in the property to secure himself in a security debt which he promised to see paid by Tapscott and Meredith: he was satisfied with the arrangement between Bates and Meredith, and did not bid for the property; he did not hear Mrs. Rose’s name mentioned at the time; he was listening, they did not know it; he did not hear all that was said between them, but enough to satisfy him of the arrangement. The conversation was before the sale ; don’t recollect of any thing being said about passing of papers. He is certain that the conversation above alluded to was on the morning of the second sale, because he was induced to come up by hearing of the purchase by Dr. Meredith at the first sale, and his failure to pay the money. At the sale at which he was present Bates bid off the property at $365 or $366.
7. Deposition of H. Peake, who states that at the term of the Marion circuit court, when the brick house in Hannibal, the property of Tapscott and Meredith was sold, and immediately thereafter Dr. Meredith *42 and M. D. Bates came into the portico of the court house where he was standing, when Dr. Meredith informed him that Mr. Bates had purchased the house for the amount of his execution, and had agreed that Meredith nrght redeem it, to which Mr. Bates assented, saying that he was to have good interest for his money, but did not say what interest.
8. Deposition of Z. G. Draper, who states that he was present at the sale of the property in dispute—the second sale. Previous to the sale, at the request of Dr. Meredith, he had spoken with Mr. Bates, endeavoring to ascertain if an arrangement for further time, for the payment of the debt, could be made ; but on the morning of the sale did not know whether an arrangement had been made or not, until after the sheriff had proclaimed the sale of c< Hannibal property,” when he started from the door of the clerk’s office toward where the sheriff stood; before reaching the place he met Bates, who said there is an arrangement about this property. I am to purchase it and give an arrangement or paper on the payment; whether arrangement ov paper was the word used by Bates, he is not certain, but his understanding was that it was tobe an obligation for the reconveyance of the property on the payment of Bates’ claim. He intended at the moment of the proclamation by the sheriff of££ Hannibal property for sale ” to bid for the property, and purchase it if it went for $590 or $600 ; but upon the annunciation of Mr. Bates that an arrangement had been made between him and Dr. Meredith, the witness declined bidding, and returned to the clerk’s office on other business. Mr. Bates has since informed witness that he purchased the property referred* to, at the time spoken of by him. Witness is certain that this was the second sale, for at the first Dr. Meredith was the purchaser, but it was said he was unable to pay the amount bid.
Cross Examined.—He thinks the conversation had with Mr. Bates and the sale spoken of, took place on Tuesday; but of the precise day he cannot be positive. From the conversation of Mr. Bates, who informed me that Dr. Meredith had previously bid off the property, but was unable to comply with the terms of the sale, and the statement of both Bates and Meredith that Bates bought at the sale of which I have spoken, I am satisfied the remarks of Mr. Bates heretofore detailed concerning an arrangement, was just prior to the second sale.
9. The testimony of Jamison F. Hawkins, who states that he was tenant in possession of one part of the house at the time of the sale and purchase by Bates; that after the sale Dr. Meredith called on him for a settlement of the rent, which he declined paying until he saw Mr. Bates ; *43 that he saw Bates, who told him to pay Mrs. Rose or Meredith, and that he did so.
10. The lease to Hawkins and Son, and G. H. & R. C. Shackleford, dated 9th January, 1840, of the house in question, for three years, at $666,66 per year.
11. It was admitted on the trial that Mrs. Rose paid the taxes on the property in question, and that the same was assessed to her in 1842, and since.
12. Samuel J. Harrison testified that in January, 1843, he rented one half of the house from Mr. Brady, as agent for Moses D. Bates, at $100 for six months, and occupied it until the next spring, paying at the same rate; a portion of the rent was expended in repairs; paid the rent to Brady as agent for Bates, until notified by Mrs. Rose not to pay, since which time no rent has been paid to any one.
13. T. R. Sehn testified that he had occupied the corner room as subtenant of Bates, and also rented the room of Mr. McDonald as the agent of Bates, at $175; continued in possession about nine months ; paid the rent to McDonald.
14. W. H. Davidson testified that he rented the corner room from the agent of Bates, at $175 per annum ; he has expended upwards of $40 in repairs by consent of both parties.
15. M. McDonald testified that the firm of Blain and Green occupied the corner portion of the property in question for one year, and the rent was paid by them.
16. James Brady testified that shortly after Bates purchased the property, the Shackleford’s, who were in possession under a lease from Tapscott and Meredith, surrendered the corner half of the house to Bates, and Bates appointed him his agent; that as such agent he leased to Harrison at $200 per year, and received a part of the rent which he applied to an account between him and Bates; that Bates subsequently appointed McDonald his agent, who has continued to rent the property since. The corner part of the house has been worth from $175 to $200 per year, and one year rented for $275; the other part of the house has never been in Bates’ possession.
17. Articles of separation between Samuel Rose and Ann Rose his wife.
18. Lease from Ann Rose to John Duncan for certain property in South Carolina.
19. Deed from the master in equity to Julius Pringle, in trust for Ann Duncan, afterwards Rose.
*44 20. Deed from Wm. Fair to same. These deeds conveyed certain real estate in the State of South Carolina.
21. Deed from from James Buring to Ann Rose, conveying certain real estate in Pennsylvania.
The defendant’s evidence consisted of
1. The testimony of Buckner, who testified that he cannot state certainly the time he held the first conversation with Dr. Meredith, but thinks it was prior to the first sale. Dr. Meredith approached him on the subject of Mr. Bates purchasing in the property ; told him that Bates had agreed so to do, and was consulting with Uriel Wright and witness how it should be done ; Wright as the attorney of Meredith, and witness as attorney of Bates. Meredith spoke several times of getting from Bates a writing to reconvey on payment of his debt; to this, as Bates’ attorney, he objected, for the reason that it would vitiate the sale, and be no more than a mortgage, and not so good as his lien under the judgment, and he told Meredith that so long as he or Wright lived there could be no difficulty; he is of the impression that the above conversation took place previons to the first sale. Sometime after the second sale, on his way home, he was overtaken by Dr. Meredith, who told him that Bates refused to let the land be redeemed ; he was at that time under the impression that Bates would let him redeem, and so told Meredith, and also told Meredith that he would see Bates on the subject. He did afterwards see Bates, who positively refused, saying he was under no obligation to Meredith, as he had bid against him, and thereby set aside all understanding between them. In the same conversation, or a short time thereafter, Bates said Meredith might redeem if. he would pay off a note which he held against Clark, saying all was Hannibal business, and he would not lose by Hannibal.
He was not present at either sale, though he cannot speak with entire certainty; he heard a conversation between Meredith and Bates in front of the court house, but thinks it was at the term of the court after the sale took place. Meredith contended that Mrs. Rose had a right to redeem, whilst Bates denied her right, and asserted that the agreement to that effect only extended to the first sale. He does not recollect of the parties speaking to him to write any papers after the second sale; he received a number of letters from Dr. Meredith, all of which were returned to him except one which was lost. He does not recollect the purpert of the letters, but they were on the subject above spoken of, and some other business. He does not recollect of ever having applied to Bates for a title bond for Meredith, nor does he believe he ever did* *45 as it was liis advice to Bates not to give one. He was of opinion that Bates would let Meredith redeem, until otherwise informed by Bates; cannot state whether or not Meredith was present when he conversed with Bates on the subject. In the conversation had between Wright, Meredith and witness, the name of Mrs. Ann Rose was mentioned frequently in connection with the business, but cannot now say exactly how.
The foregoing constituted the evidence before the court below upon which the decree was rendered.
The testimony on a preliminary point in this case, shows that the complainant, Ann Rose, prior to her marriage with Samuel Rose, was possessed of a large estate, held in trust for her by trustees; that some time after her marriage with Samuel Rose, a separation took place between them, and articles of separation were executed on the 19th March 1824, between Samuel Rose of the one part, and John Duncan the father ofMrs. Rose of the other part, by which the said Samuel relinquished and renounced all his marital rights, and agreed that thereafter the said Ann might exercise ail the rights of & feme-sole, trader, by the purchase and sale of real estate, &c., &c., free from the control, hindrance, &c., of the said Samuel, &c., whilst Duncan undertook on his part to save harmless the said Samuel from all debts, liabilities &c., of his wife.
It further appears that a short time after the separation, Mrs. Rose removed to the State of Pennsylvania, and with the remnant of her large estate, still sufficient with economy and prudent management to afford her a support, purchased property there, where she continued to reside until her removal to this State in 1835, with her son-in-law Dr. Meredith, who had married her only child; that before and after Mrs. Rose’s removal to Missouri, she had loaned Dr. Meredith about $10,000, constituting nearly the whole of what was then left to her.
That Meredith continued to use her money, supporting her in the meantime, until he become embarrassed in trade, when to secure a portion of the amount due her, he executed, on the 7th December 1841, to her a mortgage on the property in controversy, estimated by him at the time to be worth about $5,U00.
That during all this time, from the year 1824 up to the hearing of this cause in March 1848, Samuel Rose has not appeared to reclaim or assert his rights, nor has he been heard of for the last ten years, when he was sojourning in the State of New York.
Now as a general rule, unquestionably Mrs. Rose could not maintain a suit in her own name, but the suit would have to be brought in the name of *46 the husband, Samuel Rose, notwithstanding the separation. Yet to this general rule there are exceptions, as where the husband was exiled ; then the wife was permitted to sue in her own name. 1 Coke Lit., 132 A. And the same reason applying where the hirsband has abjured the realm, the wife was permitted to sue for her dower as though she were a widow. She may maintain in such case trespass. 2 Moore, 851. She may sue for jointure, and may also be sued as a feme-sole. Roll. R. 188 ; she may also make her will. 2 Yern 614 ; and in all things act as if her husband were dead, the necessity of the case requiring that she should have such a power. Indeed, banishment and abjuration have been uniformly held a civil death of'the husband, and removes the disabilities of coverture, restoring the wife to all the rights and liabilities of a feme covert, and even though the banishment be for a limited time, and that time had expired, unless the husband had returned and assumed his marital rights. 3 P. Will, 37. So, also, have the facts and circumstances which should be considered as proof of having abjured the realm, been liberally regarded, as where the husband resided abroad, leaving his wife to trade and gain credit as a feme-sole. This has been adjudged sufficient to render her liable as a feme-sole. 1 B. & P., 357.
The wife of an alien enemy has also been held liable to suits, as the husband was not amenable to the process of the court. 1 Ld. Ray 147.
Other cases might be cited, but these are sufficient to show some of the exceptions to the general rule of the wife’s disability to sue and be sued, as recognized by the english courts. These cases were of course decided upon the general law, without reference to the custom of London.
The same exceptions recognized by the english courts, have received the sanction of the courts in this country, where the question has been adjudicated.
The case of Gregory vs. Paul, 15 Mass. R. 31, was where a bequest had been made to the plaintiff, which the executor refused to pay. Suit was brought, and the defence was that the plaintiff was a feme covert, having a husband residing in England. She replied, alleging that her husband had deserted her, and departed from the place of her abode, without leaving her any means of necessary provision and support, and from that time had not corresponded with nor returned to her, and that, during all that time, she hath lived apart from her husband, and maintained herself as a single woman, and during the five years last past, and upwards, she had resided and lived in Massachusetts, and still lives therein, and her husband is a native of Great Britain, and from his birth *47 has lived within the said kingdom, and has never been in the State> of Massachusetts, or within any of the United States.
To this replication the defendant demurred.
After an examination of the english authorities on the subject, the court say : The case at bar comes within the spirit of the rule of the common law, founded in reason and necessity, in cases of exile and abjuration. The plaintiff has been domiciled here for many years as a feme-sole. Her husband is an alien^and never was, and is not expected ever to be, in this country. He abandoned his wife, and for a great number of years made no provision for her support in his own country, but he has compelled his wife to abjure it. This should not make the case better or worse for her; if the husband had been a native citizen, and had deserted his wife, and became a subject of a foreign State, the law would be clear for her upon the adjudged cases. We are satisfied that the plaintiff may acquire property, and be permitted to sue, and is liable to be sued as a feme-sole, and that her release would be a valid discharge for the judgment she may recover.
The case of Abbott vs. Baily, 6 Pick. R. 89, only differs from the other case in this, that the husband of the plaintiff resided at the time in the State of New Hampshire. The court held, however, that so far as the question of the wife’s right to sue was involved, the residence of the husband in another State of the confederacy was equivalent to a residence in Canada or Novia Scotia; that the husband was as much beyond the jurisdiction of that court residing in New Hampshire, as if he resided in a foreign government; that proximity can make no difference for the line of jurisdiction is, in a political point, an impassable barrier.
The exceptions, though dictated by necessity, are founded in wisdom and humanity, for miserable indeed would be the situation of these unfortunate women, whose husbands have renounced their society and country, if the disabilities of coverture should be applied to them during the continuance of such desertion. If that were the case, they could obtain no credit on account of their husbands, for no process could reach him, and they could not recover for a trespass upon their persons or property, or for the labor of their hands. They would be left the wretched dependants upon charity, or driven to the commission of crimes, to obtain a precarious support.
Some reliance was seemingly placed upon the contract or agreement of separation, executed by Samuel Rose and John Duncan, by which Rose undertook to confer on his wife the power of purchasing and selling real estate, of suing and being sued &c. This contract was most *48 probably entered into under a misapprehension of the law. In South Carolina, where this contract was made, the custom of London has been adopted, by which a husband can, by articles of agreement, constitute his wife a feme-sole trader, by which she become solely liable for her contracts, and may sue in her own name whenever such becomes necessary for the maintainance of her rights. But this privilege has been confined in that country, and perhaps in South Carolina, to the trade of merchandizing, and not to the acquisition or disposition of real estate. We presume it was with reference to this custom that the contract was made, but the terms extend beyond those recognized by the custom, and are inoperative that far at least.
But it is not now important to enquire how this is, as we hold that the complainant clearly had the right, by the rules of the common law, and under the attendant circumstances, to bring her action without joining her husband.
We shall now investigate the charge made by the complainant in her bill, that Dr. Meredith as her agent, acting for and on her behalf, made an agreement with Moses D. Bates, the defendant, prior to the second sale, that he Bates should bid off the property in controversy at the second sale, and that she the complainant should have the right of redeeming the same, at any subsequent time, by paying to Bates the amount of his debt and interest thereon, with ten dollars per month in addition thereto, and that upon such payment being made by the complainant, the defendant was to convey the property purchased to the complainant, by deed of quit claim.
The answer of Moses D. Bates denies that any agreement, whatever, was made in reference to the second sale, but alleges that an agreement to the same effect was made prior to the first sale, and that the defendant attended that sale, with the bona fide intention of carrying the agreement into effect, on his part, but was prevented from doing so by Dr. Meredith, who, in disregard of the agreement entered into between them, attended the sale himself, and did not only bid for but purchase the property at a sum greatly exceeding the amount of the defendant’s debt. That this conduct of Meredith was a renunciation of the agreement on his part, and absolved the defendant from all obligations thereafter ; that no new agreement was made in reference to the second sale at which he purchased, but that the purchase was made by him exclusively for his own benefit, and upon no trust or understanding, open or secret, for any other person.
The testimony of Dr. Meredith, the agent, is full, clear and explicit, *49 in support of the charge in the bill, doubtless the bill was framed upon his statement of the agreement between himself and Mr. Bates. The defendant objected to the competency of Meredith, as a witness, and to sustain his objection introduced a witness whose evidence went to impeach the credibility of Meredith. "Whether a witness be competent or not, depends in no wise upon his credibility. They are distinct grounds of objection, and the establishment of the latter does not operate to exclude the witness from testifying, for the triers of facts have the power of exclusion in such cases. Bilt, if the objection to Meredith testifying was based upon his assumed fraudulent conveyance to Mrs. Rose, the objection was equally untenable, for fraudulent conduct on the part of the witness does not render him incompetent to testify, and as between Meredith and Mrs. Rose the conveyance would be sufficient to divest him of title. The only ground of objection was that of interest, and that objection was removed by the release executed by Mrs. Rose to Dr. Meredith.
Let us then examine the other evidence in the cause, and ascertain how far it corroborates and sustains that of Dr. Meredith.
The’ answer admits an agreement as before stated. Mr. Holt< proves that an agreement was made between Meredith and Bates, on the morning of the second sale, and just prior thereto, in which it was agreed that Bates was to bid off the property and give Meredith time to redeem. He was not at the first sale, and consequently the conversation which he details could not have taken place at the first Sale. Mr. Holt had learned prior to the day of the second sale that Meredith had bid off the property, but was unable to comply with the terms of the .sale, and consequently the property would have to be re-sold. He being a creditor of Meredith, was induced to go to Palmyra on the day of the second sale, intending to purchase if the property went at a great sacrifice.
Hearing the arrangement made between Bates and Meredith, he was satisfied that no sacrifice of the'property would then take place, and left without bidding for the property.- Besides, he sfeys that at the sale which took place on the day of the convention between Bates and Meredith, Bates was the purchaser at $365. Now, at the first sale Bates was not the purchaser, nor did the property sell for $365, but for $1010. This, then, fixes the time of the conversation to the morning of the second sale.
Dr. Peak also was present at the second Sale, and immediately thereafter, Bates and Meredith came to where he was standing, and Meredith remarked to him that Mr. Bates had purchased the house for the amount *50 of the execution, and had agreed that he might redeem it, to which Bates assented, saying that he was to have a good interest on his money.
The amount of the execution was $365, and the good interest is ascertained by 'reference to the bill and answer, both of which state that it was to be ten per cent interest on the debt, and ten dollars per month rent, equal to forty per cent.
Mr. Draper was also present at the second sale, and had acted as the friend of Dr. Meredith in endeavoring to obtain indulgence from Mr. Bates, but not knowing whether an arrangement had been made, and the sheriff having proclaimed the sale of Hannibal property, he started to go where the sale was to take place, and met Mr. Bates, who informed him that an arrangement had been made about this property, by which he, Bates, was to buy in the property and give Meredith an obligation for the re-conveyance when the money was paid. Mr. Draper intended purchasing provided the property did not sell for more than $500 or $600, but on receiving the information from Mr. Bates that an arrangement had been made, he declined bidding for the property. . Mr. Draper was only present at one sale, and supposes it to have been the second, because Mr. Bates informed him that at the first sale Meredith bid off the property, but was unable to pay the amount of his bid.
Here are the witnesses whose testimony corroborates and sustains that of Dr. Meredith in' all of its material points, and establishes fully the charge made in the bill. We are then led to conclude, indeed there can be no reasonable doubt, that an agreement was made between Bates and Meredith, on the morning of the second sale, by which the former was to bid oif the property under his execution sale, and give to the latter time to pay the money, upon the payment of which, the property was to be conveyed to the complainant.
But if there was no agreement, in fact, between the parties, of the character charged in the bill, yet a court would be disinclined to ratify a sale under the circumstances of this case. Here were at least two individuals attending the sale, for the purpose of bidding for the property, and were willing to give greatly more than it sold for, who were induced by the statements of Mr. Bates, not to bid, whereby he was enabled to buy it at a great sacrifice.
The interest of execution debtors, and the fairness of legal sales, both demand the supervisory control of the courts, for every day’s observation admonishes us of the power which a creditor has over an embarrassed debtor, and the facility with which he can oppress and wrong him.
*51 The agreement being established, Bates relies upon the statute of frauds to enable him to retain the property thus acquired. But this will not avail him in the present case, it being the peculiar province of a court of chancery to enforce contracts and agreements of this character. The agreement was not that Bates should convey real estate, the legal title to which was then in him, without a writing evidencing the agreement, but an agreement that Bates should bid in the property of Dr. Meredith, on which the complainant held a mortgage, and hold the same in trust for her benefit, and to be re-conveyed on the payment of his debt, upon the tender to Bates of the amount due him under the agreement, he should, in equity and good conscience, have conveyed the property to Mrs. Rose, and the statute never was designed to aid a party in committing a fraud, but was intended to prevent frauds, and consequently it cannot be invoked to the aid of the defendant.
Wherefore, for the foregoing reasons, the decree of the circuit court is reversed and set aside, the other judges concurring herein.