WEST v. BUNDY et al., Appellants.

**Specific Performance:** STATUTE OF FRAUDS. A promise to give land, whether written or verbal, will not be enforced upon the mere proof thereof; but where the promisee, induced by and relying upon such promise, has entered into possession and made improvements, has incurred obligations and expended money for and on account of such land, and has thereby changed his condition in life, equity will compel performance of the promise which, in such case, is regarded as no longer voluntary, but as founded on a valuable consideration, and, although verbal, as not within the statute of frauds.

*Appeal from Andrew Circuit Court.*—HON. H. S. KELLEY, Judge.

AFFIRMED.

L. *Douglass* and *W. W. Caldwell* for appellants.

*Wm. Heren & Son* for respondents.

MARTIN, C.—This was a suit in equity, commenced on the 16th day of February, 1877, for the purpose of adjudging and enforcing a contract for the conveyance of a farm. It was brought by the heirs of Marion Bundy against Milton J. Bundy and Mary A. Adams, the widow of James A. Bundy, deceased. It is alleged in the petition that in February, 1870, James A. Bundy, deceased, was owner in fee of the farm in controversy, situated in Andrew county, containing about 400 acres; that sometime in the same month, for a good and valuable consideration, he gave this farm to Marion and Milton, who were his two sons; that immediately thereafter Marion went into possession, and Milton soon after entered with him into the joint possession thereof; that they expended great labor and large sums in making valuable improvements thereon, claiming the same as their own; that said James A. Bundy, the donor, promised to deed the farm to them and made out deeds for the same, but neglected to deliver the same as he

had promised; that Marion died in possession of said farm intestate and unmarried, and that plaintiffs are his heirs.

It is further alleged that after the death of Marion, his brother Milton, in 1873, brought suit against James A. Bundy, the donor, to compel a specific performance of his contract to give a deed; that said suit was compromised by a decree vesting the whole title in said Milton; that in the decree the right of Marion to one-half of the farm was recognized, and that said Milton gave his notes in the sum of $5,000 therefor to said James A., secured by a deed of trust on the land deeded to him as aforesaid. It is alleged that said James A. died in July, 1875, and that the heirs of said Marion, plaintiffs to this suit, are also the heirs of said James A. The plaintiffs claim that said Marion was entitled in equity to one undivided half of said farm, and that the same is vested in the plaintiffs. It is prayed that the judgment in the compromise suit be set aside, and that Milton J. be adjudged to convey an undivided half of said land to plaintiffs.

After the suit was brought, Mary A. Adams, the widow of James A. Bundy, and her second husband, upon their joint application, were made parties to the suit. Milton J., being a non-resident, came in after publication, and suffered default while personally present in court. This left the litigated part of the controversy to go on between the plaintiffs and the widow of James A. Bundy, who claimed to be his sole devisee and owner of the notes and deed of trust. In her answer, after admitting the ownership by James A. Bundy, and the fact of the suit and the compromise, she makes denial of the petition. She also sets up new matter, to the effect that the notes and deed of trust were given to James A. Bundy in consideration of his procuring a quit-claim deed to said Milton from one Douglass, who possessed the legal title to the land; that the quit-claim was procured and the notes and deed of trust were delivered to said James A. in his lifetime, who assigned and delivered them to her trustee for a good and lawful

consideration; that she is the legal owner of the notes and deed of trust; that Milton J. is possessed of no property in this State out of which the same can be made; that James A. Bundy died in April, 1874, and left her sole devisee as to all his real and personal property; that as the widow of James A. she is entitled to one-third of the land and notes in the right of dower; that Milton J., in 1875, entered into possession and is now wrongfully in possession of said undivided third, unjustly withholding the same and the rents and profits thereof. The court found the issues in favor of the plaintiffs, and rendered a decree to that effect on the 10th day of December, 1877. Mrs. Adams and her husband have prosecuted this appeal.

It only remains for us to determine whether the evidence supports the decree. It will be necessary for us to recite the substantial part of the testimony, noting the controverted points to which it was directed. That the testimony should be conflicting in a case of this kind is to be expected. Notwithstanding this, the equity to be administered in this case ought to be clear and commanding, to justify the issue of its extraordinary and far-reaching mandates. The counsel for the defendants have furnished a very elaborate and able brief discussing the principles which govern the character of this class of actions. This is altogether unnecessary. The equity invoked by the plaintiffs has been so often recognized and defined in the decisions of this State that nothing is left for conjecture or debate. An agreement for the gift of lands will not be enforced against the donor upon mere proof of the promise or undertaking to give, however clearly it may be proved, and whether it be written or verbal. As long as the obligation is executory and rests solely upon the declarations, promises and undertakings of the donor, he may revoke it and equity will not compel him to fulfill it. But when the promise has been accepted in good faith, and the donee on the strength of it has changed his condition in life, entered into possession of the land, made improvements, incurred obli-

gations and expended money for and on account of it, equity will compel the donor to keep his agreement and make perfect his gift. Under these circumstances it is held that the acts and doings of the donee take the promise out of the statute of frauds if it is by parol. And whether written or not written, it ceases to be any longer a voluntary agreement; the acts and doings aforesaid of the donee taking the place of and constituting a valuable consideration to support the promise and call for its enforcement. There is no doubt about this being the law in this as well as most of the states. *Halsa v. Halsa,* 8 Mo. 303; *Sutton v. Hayden,* 62 Mo. 101; *Sitton v. Ship,* 65 Mo. 297; *Lobdell v. Lobdell,* 36 N. Y. 327; *Freeman v. Freeman,* 43 N. Y. 34; *Peters v. Jones,* 35 Iowa 512; *Bright v. Bright,* 41 Ill. 97; *Shepherd v. Bevin,* 9 Gill 32; *Neals v. Neals,* 9 Wall. 1.

The only difficulty which is encountered attends the application of these principles to the contradictory and conflicting testimony which is almost invariably presented in this class of actions. It appears from the evidence that, in 1869, James A. Bundy was a gentleman of considerable wealth, valued at $35,000, or more, residing in Galesburg, Illinois, his wife still living; that he had two sons named respectively Marion and Milton, both married men; that Milton was residing in Kansas on a farm of his own which his father had helped him to purchase; that Marion was a man of dissipated habits, whose wife had been compelled to leave him and sue for divorce; that his father thought it would be beneficial to him to settle him down on a farm, and to that end looked round for one; that after examining several in company with Marion, he finally concluded a purchase of the one now sued for, which pleased him, and bought it from Mr. Sanders, the owner, for $14,000, of which three or four thousand dollars were paid down in cash, and the balance in the following March, when possession was to be given. At the time of the purchase Mr. Bundy declared frequently that the farm was bought for Marion, and that he intended he should have it. Marion

entered upon the place at once in 1869 with the license and permission of Sanders, and was allowed to do anything there which would not conflict with his work or interest. He boarded with Sanders, hired men and planted hedges and re-set rail fences. In the spring of 1870, he purchased property for the farm, but with money furnished by his father. James A. Bundy, after shipping some hogs to the farm, came out from Galesburg about the 1st day of March. On being asked when he purchased the farm, to whom the deed should be made, he said, after some little hesitation, to himself, conveying the impression that he wanted to see how Marion would conduct himself. Mr. Sanders testified that Marion received the farm and regulated it as his own.

It seems that prior to this purchase the father in company with Marion had visited Milton in Kansas, and gave. him to understand they were looking at farms in Missouri, had selected this one but would not buy till it was seen by their mother; that immediately after it had been seen by her, and had been purchased, James A. Bundy wrote to Milton to that effect, but did not say for whom he had bought it; that in December, 1869, after the death of Mrs. Bundy, the father wrote to Milton that the farm was large enough for both Marion and himself, and that if he would go over to it he would give it to them. This letter was lost. Milton, on receiving the letter, visited the farm in December, 1869, found Marion on it with the Sanders family, stayed a week, and then returned to Kansas to prepare to remove his family. He was accompanied with Marion who stayed till January 1st, 1870, when they both returned to the Missouri farm taking along some goods. After staying in Missouri a few days they returned to Kansas, made sale of Milton's goods and returned again to Missouri. Their father was then on the farm. In February, 1870, Milton unloaded a part of his goods, when a misunderstanding took place between him and his father about the management of the place, and after staying two weeks he moved back to Kansas.

In May, 1870, James A. Bundy returned to Galesburg, where he stayed till October, 1870. He then took a trip to California, and there married his second wife, defendant in this case. He returned with her to the farm in December, 1870, where he remained some time, then returned to Galesburg where he stayed a few months, and then went to Massachusetts. These must have been only temporary trips, as Mrs. Adams testifies that they resided on the place from December, 1870, till October, 1871, when they went to California on account of Mr. Bundy's health. They returned in March, 1872, to the farm, and left it for Galesburg in May, 1872, where they continued to reside. During this year Marion was paralyzed by a fall from his horse, so that he became a helpless invalid who had to be fed at the table. In October. 1872, James A. Bundy wrote a letter to Milton saying that he intended to give them the farm. On the faith of this letter he moved to it, again leaving his farm in Kansas. In this letter, which is lost, Milton was invited to come and take charge of the farm, take care of Marion, who was an invalid, and not expected to live long, and have the whole farm on Marion's death. Milton moved on the farm, took care of Marion till he died in 1873, and continued to reside on it and use it as his own. He divided the rents and profits with Marion till his death, and after that received them entirely to himself. During this time he broke up twelve or sixteen acres of wild land, trimmed hedges, repaired fences, built a feed lot, put in a pump. seeded down about ninety acres in grass and paid taxes and insurance on the place. Waterhouse, a witness, corroborator Milton in respect to declarations by his father that the place was to be given to the boys, and that Milton was to have it after the death of Marion.

Matters thus continued till 1873, when it would seem that Milton became solicitous about the promised conveyance, and writes to his father about it. On the 12th day of February, 1873, his father, from his home in Galesburg, answers as follows:

"GALESBURG, ILL., February 12th, 1873.

"MILTON: I have just got and read your long letter. I just mailed you a long letter. I am perfectly surprised at your letter, and in answer will only say that I have made a deed to you and Marion to the farm; I fully intend you to have it. You need have no fears of my going back on what I say to you."

On the 3rd day of May, 1873, the father writes again:

"GALESBURG, ILL., May 3rd, 1873.

"MILTON: I undertake to answer your unwise letter again. I wrote you to Kansas on this subject, and I supposed that would be a finality in the matter, etc. You have no reason to dispute my word as you do, when I tell you time and again the same thing—that I have made a deed to the farm to you and Marion, and I did it under-standingly, and have no disposition to want to change it. I have not said a word nor had a thought of selling the place. I have no care of it whatever—leave that matter entirely with you and him. I shall pay no attention to it, no more than if I had never owned it. You and him can do just as it suits you. Now I wrote you this much to Kansas."

These letters contained other matters which need not be mentioned here. They would seem to indicate that the inner life of the Bundy family was somewhat wanting in that domestic sweetness and repose which nothing but mutual confidence and affection between its members can guarantee or preserve. There are several letters from Milton to his father in September, October and November, 1873, in which it is evident he is disappointed at not getting the promised deed for the place. He describes the condition of his place in Kansas as depreciated and wasted, by reason of his absence in Missouri, and intimates that he cannot give up the Kansas place and continue on the Missouri farm any longer than the coming season, while the title was still withheld from him. Marion was dead and Milton was settling up his affairs.

Late in 1873 Milton brought suit against his father to compel a conveyance of the land according to his promises. On the 9th day of June, 1875, this suit was compromised. At the time of the compromise, it appears that the title of James A. Bundy had been conveyed to Leander Douglass, one of Mrs. Bundy's present attorneys, on the 13th day of November, 1873. By the compromise the full title to the land was vested in Milton Bundy by execution of a quit-claim deed from said Douglass. Milton then executed a deed of trust upon the whole tract to secure $5,000 payable to Mrs. Bundy's trustee. The next month James A. Bundy died, leaving a will wherein he bequeathed $5 apiece to each of his children and grandchildren, and the balance of his estate, amounting to about $25,000, he devised to his widow.

It is objected by the counsel for appellant that the evidence is too vague and uncertain to establish the existence of a contract or promise to convey. If the promise to convey is to be gathered from the repeated declarations of the donor, the objection might be considered, but even then I am inclined to think that they disclose with sufficient certainty the intent of the donor to convey the farm to his sons, and this is the ultimate fact to be proved. *Sutton v. Hayden*, 62 Mo. 101. But outside of the oral declarations, the assurance that the farm was theirs is written down so clearly in his letters as to leave no doubt about the matter. These letters also corroborate Milton in his testimony that similar letters had been written to him while he was in Kansas in October, 1872, upon the faith of which he came the second time and took possession of the farm. The testimony of Mrs. Adams, that the sons were as tenants and not as donees, is not sustained by anything I have been able to discover, which points to a tenancy. What was said by Marion about the farm when creditors visited him for payment, is not entitled to much weight in the determination of the true relation which existed between him and his father. The same is true about the power of attorney which

he held.    I am satisfied that the court was right in adjudg-
ing the gift which had been accepted and acted upon so
long by the sons, that it would have been a wrong on
the part of their parent to refuse to keep his promise of a
deed.

It may to a casual reader seem strange that, if the
parent actually intended to give his sons this farm, he should
have been so vacillating in his conduct.    By his second
marriage, in 1870, a new member was introduced into the
family, whom he had undertaken to provide for.    It is nat-
ural that she should not favor the fulfillment of the promise.
It is evident that she possessed sufficient influence to over-·
come his written and oral wishes in the matter.    The same
influence which could obtain a secret deed from him to her
attorney, and secure a will which gave everything he died
possessed of, disinheriting children and grandchildren, must
have been sufficient to forbid the promised conveyance.    It
certainly was sufficient, after a deed to the farm was deliv-
ered to her attorney in November, 1873.    After that the
donor was no longer able to do as he wanted to.    The secret
deed and the will constitute the key of the situation, which
unlocks the chambers to his home in Galesburg, and ex-
hibits the donor promising the Missouri farm to his sons,
while being secretly persuaded to give it to his wife.    In
his deposition taken in the suit of his son Milton against
him, he says:    "I encouraged the plaintiff (Milton) to be-
lieve I intended to give him the farm in my letters, and in
no other way."    Upon the whole I am satisfied that the
evidence supports the decree.

The widow was not entitled to dower in this land, be-
cause her husband had impressed it with the trust in equity
prior to his second marriage.    But as sole devisee under the
will of her husband, James A Bundy, she is owner of that
portion of Marion's half which he inherited from Marion as
well as that portion he inherited from his daughter Angeline
Gordon who died after Marion and before the testator, ag-
gregating about five-fortieths of the whole title.    Milton is

entitled to a similar quantity in the same way. The interests of all parties in the land ought to be recited. The decree will be reversed and cause remanded with directions to enter a modified decree for plaintiffs, reciting the interests and estates of the parties according to the evidence in the record as set forth in this opinion. PHILIPS, C., concurs; WINSLOW, C., absent.