# CHARLES W. THIERRY v. CHARLES W. THIERRY, JR., and HELEN THIERRY, Appellants.

### Division One, April 6, 1923.

1. **PRACTICE: Defect of Parties.** A defect of parties apparent on the face of the petition should be raised by demurrer, and not by answer, and is not for consideration on appeal unless raised by demurrer.

2. **WITNESS: Husband of Deceased Wife: Resulting Trust: Admitted in Answer.** In a suit by a father to set aside a conveyance to his son of real estate, a part of which it was alleged was paid for by plaintiff and the title taken in the name of his wife, who at the trial was dead, it was not error to permit plaintiff to testify that he paid for all the property that stood in his wife's name, where the answer had stated that the property had been given by plaintiff to his wife as an absolute gift, in order to escape liability on bonds which he habitually executed for all contractors.

3. ———: ———: ———: **Previous Tantamount Testimony.** Nor was such testimony by the plaintiff erroneously admitted where he had already testified, without objection and without a motion to strike out, that the consideration for the purchase of the property conveyed to his wife was his own money.

4. ———: ———: ———: **Like Testimony by Defendant and Others.** Nor was it error to permit plaintiff to so testify where his daughter and defendant himself testified that their mother never had any property of her own or any income except what plaintiff gave her for household expenses.

5. **RESULTING TRUST: Provision for Wife: Rebuttable Presumption.** If the husband pays the consideration for real estate and has it conveyed to his wife the presumption is that he intended it as a settlement upon her. But the presumption is rebuttable, and if the facts and circumstances demonstrate that no such settlement was intended, she will hold the title in trust for him, just as if she were a third party. Where a part of plaintiff's business was the buying and selling of real estate, and he paid for all the property purchased, and placed the title in his wife's name simply to disqualify himself from being accepted as surety on the bonds of others, and thereafter received all the rents, made all the improvements and paid all the taxes and other expenses, the wife held the title in trust as a matter of convenience for him, and he was the beneficial owner.

6. **VOLUNTARY DEED:** Made for Convenience of Grantor. A deed, without consideration, made by an aged father to a son, who was a physician, upon a suggestion from the son that his mother's health was failing and that she was going into such decline as might prevent her from executing deeds when the father found a favorable opportunity to sell, and that the father and mother should unite in making a conveyance to him, and such conveyance having been made upon his assurance that he would hold the property for his father's convenience and make conveyances of it when and as his father requested, the father in the meantime being permitted to possess, use, manage and enjoy it and its proceeds, will be set aside at the suit of the father.

7. ———: ———: Confirmation by Grantor's Will. A voluntary deed from a father to his son, made for the father's convenience at the son's suggestion and upon assurances that he would convey the property when and as the father requested, is not confirmed by the father's subsequent will, which, at most and on its face, is but an admission of the father that the deed was a provision for the son, and has no probative effect as such admission, nor is it to be considered the father's will, if dictated by the son, and is in fact the son's will.

8. **PAROL AGREEMENT TO CONVEY:** Specific Performance: Statute of Frauds: Inapplicable. The Statute of Frauds does not apply to a parol agreement to convey lands which has been acted upon by the promisee, who, on the faith of the promise to re-convey, goes into possession and expends time and money in making and maintaining improvements and in paying taxes and insurance; and particularly so, where the promisor, without consideration, obtained title by a deed of convenience from the promisee, and such acts of ownership have extended through a long term of years, and have continuously been known and acquiesced in by the promisor.

9. ———: ———: Trust Ex Maleficio. A trust arising *ex delicto* or *ex maleficio*, that is, by the wrong or deceit of defendant, will establish a constructive trust in him, and will not be regarded as an express trust, or within the Statute of Frauds. Where a son induced his aged father and mother to convey to him real estate, paid for by the father, though the legal title was in the mother, upon the assurance that, if sold, he would convey it as and when the father requested, a court of equity, upon a violation of the parol agreement by the son, will decree the title out of him and into the father, although the father joined in the conveyance of convenience to the son, which was not necessary, since the effectual transfer of the title to him was made by the mother.

10. ———: ———: Fraud. The Statute of Frauds cannot be invoked to accomplish a fraud. A son having suggested to his father

that his wife was in such declining health as might make it impossible for her to join him in conveying his real estate, which was paid for by the father, although the legal title, as a method of disqualifying him from becoming surety on contractor's bonds, was in her, promised that if the property were conveyed to him he would re-convey it as and when the father requested. The son paid nothing for the conveyance, and it was not a gift or an advancement, but a mere matter of convenience, made upon the suggestion and parol promise of the son to hold the property for the father. *Held*, that to permit the son to hold the title for his own benefit because the agreement was not in writing would shock the conscience of a court of chancery and pervert the Statute of Frauds into an instrument of fraud.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferris*, Judge.

AFFIRMED.

*John B. Reno* for appellants.

(1) The court erred in permitting respondent to testify to facts tending to establish a resulting trust in five of the six parcels of property covered by the deed of July 27, 1910, as against his deceased wife. R. S. 1909, sec. 6354; Elsea v. Smith, 202 S. W. 107; Cloves v. Cloves, 239 S. W. 145; Orr v. Trust Co., 236 S. W. 648; Looker v. Davis, 47 Mo. 145; Angell v. Hester, 64 Mo. 142; Ring v. Jamison, 66 Mo. 424; Chapman v. Dougherty, 87 Mo. 617; Smith v. Smith, 201 Mo. 533; Herndon v. Gates, 194 S. W. 46; Danciger v. Stone, 210 S. W. 865; Edmonds v. Scharff, 213 S. W. 823; Weiermueller v. Scullin, 203 Mo. 466. (2) Annie Thierry was a necessary party when the suit was filed, and her heirs were necessary parties when the case was tried, without whose presence no valid decree could be entered. R. S. 1909, sec. 1733. (3) The evidence fails to establish a constructive trust in favor of the respondent as against appellant. R. S. 1909, sec. 2868; Ferguson v. Robinson, 258 Mo. 113; Derry v. Fielder, 216 Mo. 115; Stillwell v. Bell, 248 Mo. 61; Bender v. Bender, 220 S. W. 929;

Thompson v. Thompson, 211 S. W. 56; Heil v. Heil, 184 Mo. 665, 676; Price v. Kane, 112 Mo. 419; 1 Perry on Trusts, sec. 134; Hillman v. Allen, 145 Mo. 638; Green v. Cates, 73 Mo. 115. (4) The trust declared on by plaintiff was in fraud of the rights of plaintiff's wife Annie. Ferguson v. Robinson, 258 Mo. 113; Stillwell v. Bell, 248 Mo. 61; Derry v. Fielder, 216 Mo. 176.

*William F. Smith* and *Thomas E. Mulvihill* for respondent.

(1) Respondent was not disqualified as a witness by reason of the death of his wife, co-grantor, from testifying to conversations and transactions had with appellant, relating and leading up to the execution, recording and delivery of the deed of July 27, 1910. Insurance Co. v. Broyles, 78 Mo. App. 368; Vandegrif v. Swinney, 158 Mo. 532; Fulkerson v. Thornton, 68 Mo. 468; Nugent v. Curran, 77 Mo. 325; Banking Co. v. Loomis, 140 Mo. App. 74; Birdsall v. Coon, 157 Mo. App. 385; Stanton v. Ryan, 41 Mo. 513; Weiermueller v. Cullen, 203 Mo. 472; Short v. Thomas, 178 Mo. App. 413; Orr v. Rode, 101 Mo. 398. (2) Annie Thierry was not a necessary party to the suit, neither at the time it was filed, nor were her heirs necessary parties at the time the case was tried. At the time Annie Thierry joined with her husband in the execution of the deed dated July 27, 1910, she had no heirs, and at her death, on May 21, 1920, she had no interest in the property in controversy, having previously conveyed or extinguished whatever interest she might have had in the property by joining with her husband in the deed of conveyance of July 27, 1910, whereby the title to the property in said instrument described was conveyed to and vested in appellant. Respondent is the real party in interest. Our statute is express that "every action shall be prosecuted in the name of the real party in interest." R. S. 1919, sec. 1155. (3) Respondent was competent to testify to facts creating a resulting trust in his favor in the several pieces of

property described in the petition, the title of which was in the name of his wife, notwithstanding her death at the time the testimony was given. Moreover respondent did not testify to any contract with his wife. His right to the property in question was not derived through any contract with her, but from a third party, from whom the property was purchased, and paid for by respondent with his own money, the title being carried in the name of his wife for the sole purpose of disqualifying himself from becoming surety on contractors' bonds. Freeland v. Williamson, 220 Mo. 230; Stratton v. Cole & Stratton, 203 Mo. App. 265; Bajohr v. Bajohr, 184 S. W. 77; Seabold v. Christman, 7 Mo. App. 254; Seabold v. Christman, 75 Mo. 308; Killie v. Gooch, 184 S. W. 1158. (4) Appellant's objection to the competency of respondent as a witness under Section 5410, Revised Statutes 1919, was untimely, too sweeping when made, and was therefore properly overruled. Elsea v. Smith, 273 Mo. 407; Burns v. Polar Wave I. & F. Co., 187 S. W. 147; Weiermueller v. Scullin, 203 Mo. 466. (5) The evidence in this case, and all of the facts and circumstances antecedent and subsequent to the execution of the deed of July 27, 1910, is sufficient to establish a constructive trust in favor of the respondent and against the appellant, and said trust was not, and could not be, in fraud of the rights of plaintiff's wife. O'Day v. Annex Realty Co., 191 S. W. 41; State ex rel. Cruzen v. Ellison, 211 S. W. 880; Phillips v. Jackson, 240 Mo. 310; Stahl v. Stahl, 68 L. R. A. 617.

SMALL, C.—I. This is a suit in equity, filed October 17, 1919, by the plaintiff, Charles W. Thierry, against his son, Charles W. Thierry, Jr., and his son's wife, Helen M. Thierry, to set aside a deed made by the plaintiff and his wife purporting to convey to his said son for a consideration of one dollar, seven lots of real estate in the city of St. Louis, and to invest the title thereto in the plaintiff. Said deed was dated July 27, 1910, and recorded February 28, 1911.

The amended petition upon which the case was tried

states: That at the time of said conveyance the title to one piece of said real estate was in the name of plaintiff, and the remainder was carried in the name of plaintiff's wife, Annie, and was held in trust by her for the plaintiff, who had earned and purchased and paid for said land with his own money, but had the title put in his wife's name as a matter of convenience. That the defendant, Charles W. Thierry, Jr., who was a physician, a short time prior to the date of said deed, with the intent to defraud plaintiff, deceitfully suggested to plaintiff the advisability of plaintiff and his wife conveying to said defendant all of said real estate, which was all the property possessed by plaintiff, stating that plaintiff's wife, the mother of said defendant, was falling into mental and physical decline, and was liable to be incapacitated from signing deeds at any time, so that, if a buyer should be found for any of said property, a sale and transfer could not be made. That relying upon the advice of said defendant, said deed was executed to said defendant in the trust and upon the agreement that he would hold title to said real estate for the sole use, benefit and convenience of plaintiff and would convey such lands at the request and for the use and benefit of plaintiff, as he might from time to time direct, and that plaintiff should at all times retain the possession, use and ownership of said land and receive the rents and pay the taxes and repairs and expenses incident thereto, and to manage and dispose of the property as his own. That said defendant paid no consideration whatever for said lands. That the plaintiff's wife's health did fail and she was afterwards placed in an asylum, where she died May 21, 1920. That the plaintiff sold two of the tracts of ground conveyed by said deed, which had formerly stood in his wife's name (selling one in 1911 and the other in 1914), for $2500, and conveyance thereof was made by defendants to the purchasers, plaintiff receiving the whole purchase price as agreed when said deed of July 27th was made. That the remaining five tracts, mentioned in said deed of July 27, 1910, have not been sold or con-

veyed, and the record title still stands in the name of said defendant. That plaintiff is, and ever since said deed was made, has been in possession of all of said lands and received the rents, issues and profits thereof, and paid all taxes and expenses thereof in pursuance and execution of the trust, agreement and understanding between the plaintiff and said defendant at the time said deed was made. That shortly before this suit was commenced, and while his wife was still alive, plaintiff requested the defendant to reconvey said unsold property to him, but said defendant refused to do so in disregard of his agreement and duty and in fraud of plaintiff's rights in the premises.

The answer put the allegations of the petition in issue, and pleaded defect of parties, in that it appeared from the face of the petition that plaintiff's wife, Annie Thierry, was a necessary party. Also pleaded that said conveyance was intended as a gift or advancement "by way of anticipation of defendant, Charles W. Thierry, Jr's, share of the estate of his father and mother. And that at the time said conveyance was executed, plaintiff had a quarrel or dispute with his daughter, Annie, then and now, the wife of one John Scherrer, and that, then and there, in order to cut off said daughter, Annie, from any share in the enjoyment or participation of the properties described in the petition, executed, together with his wife, the instrument of July 27, 1910, without solicitation, advice or request, on the part of the defendant, and as a gift by way of advancement, and in order to prevent his said daughter, Annie, from receiving any share of the estate."

For a further defense, the answer states that the plaintiff induced his wife to join in said conveyance to said defendant, in order to defraud plaintiff's wife out of her interest in said property. Further answering, defendants say they have no knowledge "as to whether plaintiff paid the consideration for the purchase of property, the title to which was taken in his wife's name, but state that the same was given her absolutely as a gift;

and at the time of the purchase of the properties described in plaintiff's petition, the title to which was in Annie Thierry, plaintiff was accustomed to become surety for various contractors," and "in order to escape the enforcement of" liability on such bonds "the title to the various properties described in plaintiff's petition was taken in the name of his wife, Annie Thierry."

The reply put the new matter in the answer in issue.

There were three witnesses who testified on behalf of the plaintiff—the plaintiff himself; his daughter, Mrs. Annie Scherrer; and the plaintiff's brother, Theodore Thierry. Plaintiff also read in evidence the deposition of the defendant, Charles W. Thierry, Jr.

The following facts and circumstances, without any serious dispute, seem to be established by the evidence: At the time of the trial plaintiff was over 78 years old, and had lived in St. Louis 70 years; born in Kentucky. Had been in plumbing business and contracting business for 40 or 50 years. Was in business with his brother, Edward Thierry, from 1880 to 1912. In addition to the plumbing and contracting business he, for over 30 years, was engaged in buying and selling real estate and building houses. During that time he handled from 25 to 30 pieces of real estate. That he purchased and paid for all of said real estate with his own money. That the title to a large number of the pieces of real estate purchased and sold by him was by him placed in his wife's name, including six of the seven pieces of property described in the petition. That the plaintiff always received and retained as his own the price for which any real estate was sold and always collected and appropriated all the rents and income thereof without accounting to his wife; his wife neither received nor claimed any. That he always paid the taxes and insurance and for the repairs on all of the property. That his wife never at any time claimed to own any of the property which stood in her name. That she always, without hesitating, at the request of her husband, signed or had her daughter, Mrs. Scherrer, sign for her, as she could write only in German,

all deeds and other instruments relating to the selling and conveyance of the land, which stood in her name. She made the deed in suit at the request of her husband; had no conversation with the son regarding it. That the buying and selling of real estate was part of her husband's business and that she never attended to any of her husband's business whatever; she did nothing to earn any money, she only attended to her household duties. That she had no money whatever, except small sums (how much not shown) which she might have saved from the money her husband gave her for household expenses. That plaintiff and his wife were married in 1873. They had three children, Carrie, and Annie (Mrs. Scherrer) and one son, the defendant, Charles W. Thierry, Jr. That he gave his children a good education, educating the girls in a covent, and his son in the University of St. Louis, as well as in the Medical College of St. Louis, from which the son graduated in 1898, plaintiff paying all of the expenses. The daughter Annie, the youngest of the children, was married in 1906 to Mr. Scherrer. She and her husband lived at her father's house until the spring of 1910. They had been paying but $40 per month's board after her marriage up to that time, when her father asked them to pay $60 a month, which they took as an invitation to leave, and Mr. and Mrs. Scherrer then moved away to another place, but Mrs. Scherrer returned from time to time to visit her father. The son, who was 43 years old at the time of the trial, married about the year 1906. He had lived at his father's house up to that time. He then left the paternal roof, because his parents were not pleased with his marriage. But he kept up relations with his parents, but did not visit them at their home until about April, 1910.

We are also satisfied from the testimony that after the conveyance of July 27, 1910, the plaintiff remained in possession and continued to receive and appropriate and manage and control all the rents and profits of said real estate, the same as he had always done before. He sold two pieces of the property, one in 1911, and one in

298 Mo.—3

1914, for which he received the whole consideration, which was about $2500 for both pieces. That defendants executed a deed to the purchasers at the request of the plaintiff. Plaintiff also continued to pay all the taxes and make all the repairs, the same as he had always done before said deed was made. He also purchased and paid $200 for a single strip of land to add to one of the lots, and had deed made to his son, because the title to the lot was in his son's name. He hired and paid lawyers to bring suit to quiet title as to one of the tracts. Plaintiff's wife was in failing health at and before the time the deed in question was made. They broke up housekeeping about 1912, and boarded for three or four years. Her health continued to fail, and she was in a sanitarium for five or six years before her death, which occurred on the 21st of October, 1920.

There was no witness present at the time the deed in question was delivered to the defendant, Charles W. Thierry, Jr., by his father, the plaintiff. The testimony of the father and son is conflicting as to what was said and done at that time. The father testified: That a few days before July 27, 1910, the defendant, his son, said to him, "Father, you had better do something with your property, so as you can make good, valid deed, and I will re-convey to you at any time, as mother is failing mentally." "He said that he would re-convey at any time, if I would deed the property to him. That is what he suggested. I trusted my son, and believed the statements he made, and that is the reason I executed this deed." His son never paid any consideration for the deed. It was not made to him as a gift or advancement. "The title to the property was put in my wife's name to avoid going on builders' bonds, that I might not be able to qualify as surety on bonds." Plaintiff further testified: That a month or so before this suit was instituted, he requested his son to execute a declaration of trust in favor of plaintiff, and to re-convey the unsold property which stood in his name by virtue of said deed of July 27th, which he refused to do. The Doctor stated he wanted the property

put in a trust, but did not state what kind of a trust. The Doctor never claimed to own the property at that or at any other time.

On cross-examination, witness admitted signing a will dated October 23, 1912, by which, after giving his daughters, Carrie and Mrs. Scherrer one dollar each, he provided as follows: ''Fourth: I hereby give and bequeath to my son, Charles W. Thierry, Jr., the sum of one dollar. I make this small bequest to him, because I provided for him several years ago by certain deeds which were recorded at that time. Fifth: I hereby give and bequeath all the balance and remainder of my property of any and every description whatsoever, whether the same be personal, mixed or real property, to my son, Charles W. Thierry, Jr., to have and to hold the same absolutely and forever in trust, however for the sole and separate use and benefit of my beloved wife, Annie Mary Thierry, during the period of her natural life and after her death, the balance and residue of the same shall accrue and belong to my son, Charles W. Thierry, Jr.'' The sixth clause made his son executor and trustee without bond. Plaintiff testified that, at the time he signed this will, he was living with his son and was in bad health. That the first time he saw it, it was in the hands of the Doctor on the day of its date. That the Doctor requested him to read and sign it, and he did so. That he had not previously asked the Doctor to prepare a will for him. Aside from some personal effects at that time he had no other property except that mentioned in the deed of July 27, 1910. He did not request any witnesses to sign. Did not know how the name of one of the witnesses got on the will.

In his deposition, which plaintiff read in evidence, the defendant, Charles W. Thierry, Jr., testified: He had no conversation with his father as to his mother's health in connection with the execution of the deed of July 27th, but had talks with him about her health two or three years before that, because his mother's physician had reported to him, and he reported to his father,

that she was in failing health. He did not tell his father, prior to the execution of the deed in suit, that his mother's condition was becoming such that he had better have his mother join with him in a deed and vest the title in the witness, so that when sales could be made of these speculative properties, deeds could be made by him. First knowledge he had of deed was when his father informed him over the telephone that it had been executed and that sometime later would be delivered to him. Thought that on July 27, 1910, his mother was mentally competent to execute deed. He did not know what brought about the execution of the deed of July 27th. Shortly prior to the time suit was brought, his father wanted him to execute a declaration of trust in his father's favor, which witness refused to do, and one of the reasons he gave his father was that it was not fair to his mother. "Well, the gist of the whole matter is this, that revolves about that paper, as to what my duty was to my mother, and I asked him whether it would be fair, if I would execute this same kind of an instrument in behalf of my mother, and his answer was that he would not desire me to execute such an instrument in behalf of my mother.

"Q. Did you tell your father at that time that you claimed the property as your own? A. I made no statement. I did not have any construction to put upon it. Here was something that came up, and I was to judge it, and it was a question of judging between my father and mother, as to what their rights are. I wish to state right here, I am perfectly indifferent which way this suit is decided.

"Q. In other words, you do not claim and never have claimed to have purchased this property and paid for it, all as your own property? A. I certainly did not pay for it, and I always considered that whatever value was in the property was not my own. According to law, I did not know what my interests were. I formed no idea about the thing. I knew I hadn't paid for it, and it had been turned over voluntarily to me by my father.

I executed the two deeds. Don't know that he was expecting me to execute a deed to him and had that idea in his mind all the time.''

He suggested to his father, that their attorneys might go to some trust company and make some arrangement by which the whole thing could be settled. Had no particular arrangement in mind. There was no discussion about making a will, witness simply asked his father the purpose of the paper (the declaration of trust), and his father told him that, by advice of counsel, he wanted to make a will, and that counsel had asked him, ''Well, what you got to will?'' And that brought up the whole question in regard to the ownership of the property. ''I recall this, that he desired to make a will, and wanted to divide the property equally between one sister of mine and myself. I asked him what he wanted to leave his other daughter, who is in a convent, and he said he did not wish to leave her or the convent anything. I made no reply. I am undecided whether to execute a declaration of trust or a re-conveyance of these properties to my father.''

Louis E. Balson, a real estate agent, testified: That prior to 1910 he and his firm collected the rent for the plaintiff from the improved property described in the petition. Always sent checks and statements to plaintiff. No remittances were ever made to Annie Thierry. That the home on Cabanne Avenue was purchased by a written contract by plaintiff from William S. Balson. Balson was the seller and plaintiff was the buyer. On cross-examination, witness testified: That after July 27, 1910, plaintiff was speaking to him about improving the building on the Swan Avenue lot described in the petition. About that time, Dr. Thierry came to see him, and said, ''You know father is getting old, and we don't want him to do any more business. The property is vested in me, and I would rather you would discourage him in any business transaction.'' Witness did not know who paid for the Cabanne Avenue property. The conversation with Dr. Thierry was, that he did not want witness to

encourage his father to improve the Swan Avenue property. He would rather have him discourage him because of his age.

Defendants' evidence:

Dr. Charles W. Thierry testified: Never had any conversation with his mother as to making a deed or transfer of the property to himself at the time or before the deed of July 27, 1910, was made. That afterwards, one afternoon, his mother said, "Charles, this house is yours, you will always have a house to live in, if you care to live here, and Annie will be sorry for the way she has acted." That statement had reference to the conduct of his sister, when she left home, because she and her husband had been paying $40 a month board, and had been requested to pay $60, which they refused to do, and that led to the disturbance and the upheaval in the family and their withdrawal from the house. His father tried many times to sell the Cabanne Avenue property, but his mother always refused to sell it. She told him that a real estate agent had put up a " for sale " sign in front of the house, which he removed at the request of his mother. Three or four weeks before July 27, 1910, he suggested that his father and mother make mutual wills, but they did not do so. When his father told him over the telephone he had put the property in his name, he asked his father what did he do that for, and his father said, "Well, there is no reason for giving an explanation, I know what I am doing." A few weeks after that, he said to his father, "I don't get the purpose of this thing, for the property is in such shape and in such condition now that it will not have to go to the probate court.

"Q. One moment, did your father make any reply to that statement? A. Yes, he said, 'I fully understand that.' "

Afterwards, something was said in the papers about a modification in the inheritance laws of this State, and witness stated to his father that, no matter what change or modifications had been made in the state law, it could

not be retroactive and affect this property. His father replied. "I understand it that way."

His father wanted to sell the Swan Avenue property on certain terms and conditions, and he told his father, no, and that a few days thereafter he went to "Mr. Balson and told him that he should not enter into the sale of this property without the personal O. K. and permission from" witness. Which quoted statement was stricken out on the ground that it was a self-serving declaration.

Witness also on one occasion, after July 27, 1910, appealed to the Board of Equalization against the assessment of one of the pieces of property.

Witness further testified: That on October 13, 1912, his father was taken sick with an ulcer of the stomach, and had severe hemorrhages. On the next day, he asked his father if he had made a will, and he said, "No." Then he asked him whether he desired to make one, and he said, "Yes." Witness then said, "I will go down and see Mr. Kersting and have him draw up a will." Which was done. Witness gave the facts to Mr. Kersting, as he knew them as coming from his father. Mr. Kersting instructed him as to the manner in which it should be signed. That he mailed it to the house. In two or three days his uncle, Theodore Thierry, visited the house, and plaintiff asked him to witness the will, which was done by him and Mr. Joseph Lee. That afterwards his father's health improved, and his father had some concern as to the validity of the will, as there was no amount of money mentioned in connection with what he was to leave his children. In order to satisfy his father's uncertainty, witness again went to Mr. Kersting, and the latter drew up another will, and left one dollar to each of defendant's sisters, Carrie and Annie, and one dollar to the witness. That was the only change made. The second will was witnessed by Mr. Bourdon and Mr. Fromann at the home of the witness, where his father then resided. The first will was lost, and the second will was the one offered in evidence upon cross-examination of his father. That at the time of the conveyance of July

27, 1910, his father had no property other than the property conveyed by said deed. When the first will was made, October 13, 1912, Mrs. Scherrer came to see her father. She had heard that he was sick in bed. Her father heard that she was coming, and he said, "Tell that woman to stay out of here." This occurred before the will was signed.

Witness never told his father he would re-convey the property or deed it to him at any time, or in connection with the making of the deeds that his mother was failing mentally. He knew some of the property had stood in his mother's name. He thought it unfair to convey all the property back to his father. Therefore he thought she was being excluded from her rightful ownership of that property by the declaration of trust his father requested him to sign. His mother was then living.

On cross-examination, among other things, witness said: May have had conversation with his father regarding his mother's health between May 7th and July 27th, 1910, wherein witness reported to his father that Dr. Baumgarten, his mother's physician, had told him.

"THE COURT: Q. What was that report? A. It was that my mother was beginning to show signs of senility and that was accompanied by arterial sclerosis.

"Q. That is a matter that is progressive in its nature, is it not? A. Yes, sir.

"Q. And will terminate fatally. A. If something else does not intervene."

He communicated this fact to his father before the execution of the deed of July 27, 1910. Knew of no independent means his mother had. Only money his mother had was what she saved out of her weekly allowance. Did not know that she invested any of the money of her savings in real estate, or how she acquired the property in her name, or who paid for the property carried in his mother's name. He advised his father between May 7th and July 27th, 1910, to make a will. That witness thought something ought to be done with the

property, as his mother intended to make a visit to her daughter Carrie. But his father did not make any will at that time. He did later on, in October, 1912. At the time this will was made, he had no real estate, but may have had something from the sale of the lot to Beeler for $1,000. Witness expected his father to make this will so that it would take care of any assets that might accrue to his estate. He told his father he would go and see Mr. Kersting and have a will drafted, and he went to Mr. Kersting, and explained the circumstances that he knew in the family, and what conversations he had with his father concerning others members of the family, which he detailed to Mr. Kersting, and the latter drew it up in legal form. His father told him that his daughter Annie and her husband would not get a cent of his money. That he had received no benefits from his daughter Carrie's education; she was a nun; and even if he gave her something, she would not receive any personal benefit from it. Therefore he did not feel that he ought to give her any of it. His father wanted to cut off his married sister, Mrs. Scherrer. Witness did not suggest that to him; it was absolutely his father's free, voluntary expression, and originated with him. The chief beneficiary was his mother, as long as she lived, but that ultimately he, the witness, would be the chief beneficiary in the will. His father had no communication with Mr. Kersting. He told Mr. Kersting what he understood to be his father's attitude towards his children. He told Mr. Kersting that his mother was living, and that the estate should properly go to her.

"THE COURT: Then what else did you tell him? Did you tell him who it should go to after your mother died? A. I said, now, as far as that goes, 'What should be the proper disposition of that matter?' 'Why,' he said, 'You ought to get that.'"

Father was sick in bed at the time. Had an ulcer of the stomach and severe hemorrhages. He was in very bad shape. Thought he was in danger of dying, and therefore witness thought he ought to make a will.

"The Court: Q. He didn't give you any specific directions at that time as to the clauses of the will? A. No.

"Q. Just simply told you to have the will drawn? A. Yes, sir.

"Q. And you had it drawn as you have detailed? A. I had it drawn as I have detailed, as I thought would be desirous.

"Q. And how soon did he sign it? A. After four days.

"All I know about the deed of July 27, 1910, is what I have already stated; that the deed was drawn and signed, and· I was notified over the telephone about it. I had no conversation with either my father or mother in regard to it." His father never told him that one of the reasons for making the deed in controversy was that his sister,· Mrs. Scherrer, might not participate in or enjoy any part of his property, as stated in the answer. He did not know whether this was so or not. He let his father sell the property that was sold out of filial duty to see that his father and mother were properly maintained and cared for. That it was for him personally to decide whether they should have the use of the money from the sale of the property, and he decided that they should have this money, so that they could properly and decently live. That the charge in the answer that his father had the conveyance of all of the property made to the witness for the purpose of cheating his mother, was only a conclusion from the fact that his father asked him to turn it all back to him shortly before suit was brought. "After July 27, 1910, I always believed that I was the owner of the property." Did not recall stating in his deposition: "I always considered what value was in the property was not my own. According to law, I did not know what my interests were in it." Does not deny making that statement in the deposition. Witness further stated that he did not profit a penny's worth from the possession of· the property. That no mortgages had

been put upon the property by him, and that from 1910 until the beginning of the suit, the record title stood in him.

Plaintiff's evidence in rebuttal:

Plaintiff, Charles W. Thierry, testified: Had no conversation with his son in regard to making a will and the disposition of his property, nor as to a second will that was drawn, while residing at his son's house. Knew nothing about either first or second wills until presented for his signature. Never suggested anything to his son as to what disposition he desired to be made of his property by will. Dr. Thierry was attending him at the time. He had a hemorrhage of the stomach. Dr. Thierry called in two other doctors. At the time the second will was signed, he was convalescent. Had had bronchitis in an aggravated form. Had no conversation with his son about making a will, because his wife was about to make a journey.

In sur-rebuttal, defendant, Dr. Thierry, testified: That he was not his father's physician when he made the wills in October, 1912. He did not prescribe for him. He was under the care of Dr. Fahlen and Dr. Soper. The witnesses to the will were all present when his father signed the will.

The court below found for the plaintiff and entered a decree as prayed, from which defendants duly appealed to this court.

I. The first contention of the appellants is, that the court below erred in failing to sustain the plea in their answer that there was a defect of parties plaintiff apparent on the face of the petition, in that plaintiff's wife, Annie Thierry, was not made a plaintiff. The objection is unsound. The defect, if any, appearing on the face of the petition should have been raised by demurrer and not by answer. [R. S. 1919, sec. 1226; Crowl v. American Linseed Oil Co., 255 Mo. 305.]

II. Appellants also assert that the court erred in permitting the plaintiff to testify that it was his money

that paid for all the property that stood in his wife's name, because she was a party to the deed sought to be set aside, and being dead, her husband was disqualified as a witness to testify to anything affecting her interest in the property before it was transferred to the defendant, Charles W. Thierry, Jr., by the deed in question. This objection is untenable in this case for divers reasons: First: The answer expressly stated that the property was given to said Annie Thierry by her husband as an absolute gift and in order to escape liability on contractors' bonds, which plaintiff was accustomed to execute for various contractors. So that the consideration for the property standing in the name of his wife was admitted to have been furnished and provided by the husband by the said answer. Second: plaintiff had already testified that "the consideration for the purchase of these pieces of real estate was his own money," before defendants' objection to his testimony was made. There was no motion to strike out. Third: the plaintiff's daughter, Mrs. Scherrer, and the defendant, Charles W. Thierry, Jr., himself, testified that the mother never had any means of her own or any income whatever, except the money which her husband gave her for household expenses, from which she may perhaps have saved small sums. So that, independently of the testimony of the plaintiff, it is clear enough that the plaintiff furnished the money to pay for all of the property that was put or stood in his wife's name. We rule this point against the appellants.

*Witness: Husband of Deceased Grantee.*

III. Did the mother hold the property in her name in trust for the father? We think she did.

It is a general rule that if one person pays the consideration for land and has the title taken in another, a resulting trust arises for the benefit of the party who pays the consideration. But, if the husband pays the consideration for the property and has the conveyance

**Resulting. Trust.** made to his wife, in the absence of evidence to the contrary, it will be presumed that he intended it as a settlement upon his wife. But this is a rebuttable presumption, and if all the facts and circumstances show that no such settlement was intended, then the presumption of a settlement in favor of the wife is rebutted, and she will hold the property in trust for her husband, if he has paid for the same, just as if she were a third party. [Price v. Kane, 112 Mo. 415; Darrier v. Darrier, 58 Mo. 227; Hall v. Hall, 107 Mo. 109; Seibold v. Christman, 7 Mo. App. 254, 75 Mo. 308.]

In this case, it was part of the plaintiff's business to buy and sell real estate, and he put it in his wife's name simply to disqualify himself from being accepted as surety on bonds for others. He did all of the buying and selling, paid for all the property purchased, received all the rents, made all the improvements, and paid all taxes and expenses connected therewith. He received all the proceeds of all the property sold. His wife never in any way interferred or claimed to own any of the property or proceeds, or rents or profits thereof. She always executed all deeds and instruments he requested her to, except that she objected to selling the homestead, because it was their home, and not because she claimed to own it herself, as her daughter testified. These facts and circumstances, in our judgment, show that no settlement on the wife was intended, either by the plaintiff or his wife, in putting the title to the property in her name, but that it was intended that she should hold the title in trust for her husband as a matter of convenience and business expedience for him. We are satisfied he would not otherwise have put it in her name.

We, therefore, hold that the record shows that the title to the property in the wife's name was held in trust by her for her husband and that at the time the conveyance of July 27, 1910, was made to his son, the plaintiff was the beneficial owner of all of the property conveyed by said deed.

IV.   Did the son agree to hold the property for his father and .re-convey to him on demand?   We think he did.

The son's testimony is much weakened on account of the contradictory statements he makes as to material matters.  In his deposition, his conversation concerning his mother's failing health with his father was two or three years before the deed of July 27, 1910, was made, and it had no connection with the deed.  At the trial, he states it was between May 7th and July 27th, 1910.  In his deposition, he said that he paid nothing for the property and always considered that whatever value there was in it was not his own.  At the trial, he said he always believed he was the owner of the property.  In his deposi-tion, he said he was uncertain as to whether he would re-convey to his father; that he did not care how the suit was decided.  He then filed answer, charging his father with attempting to defraud his mother and his anticipated creditors, in order to defeat his father's recovery, and at the trial failed to produce any evidence of such fraud.  In his deposition, he gave as his only reason for refusing to re-convey to his father that it might be unfair to his mother.  At the trial, it developed that seven years before he had dictated a will to his lawyer for his father to sign, when he thought his father was dying, in which he caused both his sisters to be disinherited and undertook to confirm the deed of July 27, 1910, to himself, and then provided his mother with a life estate in the residue of his father's property, which was practically nothing, if said deed of July 27, 1910, transferred the beneficial title to him, with remainder in such residue to himself.

So, in the first part of his testimony regarding the making of this will, he endeavors to create the impression that his father at the time gave him definite instructions as to its provisions, and especially that he wanted his two daughters disinherited.  Whereas, afterwards, under examination by the court, he finally said that his

*Deed for Convenience of Grantor.*

father gave him no specific directions at that time as to the clauses of the will, just simply told him to have the will drawn and he asked his lawyer who ought to get the residue after his mother's death, and the lawyer replied, "Why, you ought to get that."

The lower court saw and heard both the father and the son testify, and believed the father. We do not feel justified from the record in differing from the learned lower court in that regard. We, therefore, find that in order to get his father to convey said property to him, the son, on account of his mother's failing health which might prevent her from executing deeds when his father found a favorable opportunity to sell, suggested to his father to unite with his mother in making the deed of July 27, 1910, to him, and stated in substance that he would hold it for the father's convenience and make deeds when and as his father requested, in the meantime allowing the father to continue to possess, manage, use and enjoy the property and its proceeds as his own.

V. But, it is strenuously contended that the plaintiff read over and signed before witnesses the said will, and that it confirmed the deed of July 27, 1910, as being made for the son's benefit and thereby conclusively nega-

Confirmed by Will.

tives the father's testimony that it was intended simply to be held for the father's convenience. We do not agree to this contention. The will, at most, on its face, is but an admission of the father that the deed was a provision for the son. The probative force of it as such admission depends upon the circumstances under which it was made. As we have seen, the will was dictated by the son and his lawyer. It is not entitled to be considered as the will or the act of the plaintiff, but of his son, and consequently is of no probative force or vitailty as an admission of the father. Long after said will was made, the son swore in his deposition that he "always considered that whatever value was in the property was not" his own; that he was indifferent how the suit was decided, and was uncer-

tain as to whether or not he would re-convey to his father. It was a question between his father and his mother as to what their rights were. So that notwithstanding the deed and the will, he knew he had no beneficial ownership in the property, according to his own testimony. We rule this point against appellants.

VI. But appellants contend that an agreement to hold land in trust, or convey land by parol, as a gift or otherwise, is void, because the Statute of Frauds requires such agreements to be in writing. But we hold that when the parol agreement to make a gift of land has been acted upon by the promisee, who goes into or remains in possession on the faith of the promise to convey, and expends time and money in paying taxes, insurance, repairing, maintaining and improving the property, especially for a long term of years, as in this case, the Statute of Frauds does not apply.

Parol Agreement to Convey Lands.

It is well settled that, where a father makes a parol gift of land to his son and promises to make him a deed therefor, and the son, in reliance on the father's promise, takes and retains possession and makes lasting and valuable improvements thereon, a court of equity will enforce specific performance of the parol agrement, and compel the execution of a deed to the son by the father. In such case, the Statute of Frauds does not apply. [Vesser v. Neff, 214 S. W. (Mo.) l. c. 187; Hubbard v. Hubbard, 140 Mo. l. c. 302; Dozier v. Matson, 94 Mo. 332; Anderson v. Scott, 94 Mo. l. c. 644; Dougherty v. Harsel, 91 Mo. 161; West v. Bundy, 78 Mo. 407; Anderson v. Shockley, 82 Mo. 250.]

VII. It seems to us that this case comes within the rule announced in the preceding paragraph. Here, the son, a man of mature years, a successful physician, made a parol promise to re-convey to his aged and infirm father on demand, land which the father had conveyed

**Rule Applicable to This Case.** to the son without consideration—which, in substance, was a promise to give it back to him. It was all the property the father had—the savings of a lifetime of labor—to support himself and invalid wife, and he was too old, to further engage in business. In reliance upon the promise to so re-convey, the father took or remained in possession of the premises nine years, and during all that time, to the son's knowledge, the father paid all the taxes, general and special, on the property, part of which was vacant; insured and repaired the property with his own funds; rented and collected the rents; cared for and managed the property; sold and received the proceeds of two lots as his own; and always believing his son would make deed therefor to him at any time, as he had promised to do. The father also hired and paid attorneys to bring suit to quiet title to part of the property, and paid $200 for a strip of ground adjoining one of the lots to prevent the building thereon from encroaching on the neighbor's land. He thus made a valuable and lasting improvement to the property.

Under the facts in this case, a court of equity would not require permanent improvements of great value to be made upon the property, together with possession and care of the property by the father for the length of time shown in this case, to support and enforce the promise of the son to give the property back to the father by making him a deed therefor when requested.

We rule that, in this case, a court of equity will enforce the promise of the son to re-convey, as was done by the court below.

VIII. It is also well settled that a trust arising *ex delicto* or *ex maleficio,* that is, by the wrong or deceit of the defendant, will establish a constructive trust in him, and will not be regarded as an express trust, or within the Statute of Frauds. For example, if A promises to buy B's property at execution sale and hold it for B, although not in writing, equity will impress the property in A's hands with a constructive trust and compel A to

execute it, as he agreed to do. [Phillips v. Jackson, 240 Mo. l. c. 335; Rose v. Bates, 12 Mo. 30; McNew v. Booth, 42 Mo. 189; Damschroeder v. Thias, 51 Mo. 103; O'Fallon v. Clopton, 89 Mo. 284; Turner v. Johnson, 95 Mo. 431; Leahey v. Witte, 123 Mo. 207; Richardson v. Champion, 143 Mo. 538; Phillips v. Hardenburg, 181 Mo. 475; Laughlin v. Laughlin, 237 S. W. 1024.]

It is true, that in all the above cases the conveyance was not made directly to the defendant by the plaintiff, but the violated agreement related to a transfer of plaintiff's land to be made by a third party to the defendant. In this case, it is true, plaintiff joined in the deed to his son, but the effectual transfer of the legal title was made by his wife, to all of the lots save one, and his joining in the deed was not necessary. So that, here, as well as in all the cases above cited, the agreement related to defendant's securing plaintiff's title from a third party and agreeing to hold it for him, in effect, the same as in all the above cases.

But the doctrine announced by the above authorities, and upon which they were ruled, is not restrictive. It is founded upon the fundamental principle that the Statute of Frauds cannot be invoked to accomplish fraud.

In Phillips v. Jackson, 240 Mo. l. c. 335, the court said: "The forms and varieties of these trusts which are termed *ex maleficio* or *ex delicto* are practically without limit."

In Leahey v. Witte, 123 Mo. 219, the court says: "Such a trust resulting 'from the acts of the party, or his acts accompanied by his agreement, is held not within the Statute of Frauds.'

" 'The ground of these decisions is that the Statute of Frauds is not to be used as a shelter for fraud; and that, where a party has by his promise to buy or hold or dispose of real estate for the benefit of another induced action or forbearance by reliance upon such promise, it would be a fraud that the promise should not be enforced; and that the method of enforcement will be

Tucker v. Frisco Railway.

through the machinery of a trust.' [Bispham's Principles of Equity, p. 275].''

In the case before us, there was something more than a mere verbal promise to hold land for the father. The son paid nothing for the land. That it was not a gift or advancement is expressly testified to by the father, and is rebutted by all the circumstances, acts and conduct of both parties in the record, which we need not again repeat, as well as by the express testimony of the son, who said, in his deposition, that he paid nothing for the property and always considered that whatever value there was in it was not his own; that he was indifferent as to how the case was decided, and had not determined whether or not he would re-convey it to his father.

Furthermore, the transfer to the son was made at his own suggestion and request with the express, and under the circumstances shown in evidence, also the implied, promise to hold it for the father. To now allow the son to hold it for his own benefit, because his suggestion and agreement by which he procured the deed, was not in writing, would shock the conscience of a court of chancery and pervert the Statute of Frauds into an instrument of fraud, to prevent which the statute was enacted. This cannot be done in a court of equity.

Finding no error in the record, the judgment of the court below is affirmed. *Brown* and *Lindsay, CC.,* not sitting.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. All of the judges concur.